**COURT OF CHANCERY**
**OF THE**
**STATE OF DELAWARE**

SAM GLASSCOCK III
VICE CHANCELLOR

COURT OF CHANCERY COURTHOUSE
34 THE CIRCLE
GEORGETOWN, DELAWARE 19947

Date Submitted: February 7, 2018
Date Decided: May 30, 2018

Donald J. Wolfe, Jr., Esquire
Matthew E. Fischer, Esquire
Timothy R. Dudderar, Esquire
Berton W. Ashman, Jr., Esquire
Matthew F. Davis, Esquire
J. Matthew Belger, Esquire
Jacqueline A. Rogers, Esquire
Elizabeth H. Mellon, Esquire
Potter Anderson & Corroon LLP
Hercules Plaza – 6th Floor
1313 North Market Street
P.O. Box 951
Wilmington, DE 19899

Jon E. Abramczyk, Esquire
Matthew R. Clark, Esquire
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street, 16th Floor
Wilmington, DE 19899

Re: *Simon-Mills II, LLC, et al. v. Kan Am USA XVI Limited Partnership, et al.*, Civil Action No. 8520-VCG

Dear Counsel:

This is, to my optimistic mind at least, the last iteration of this long running litigation over the exercise of a call right. To perhaps oversimplify, the Plaintiffs had the right to call partnership interests, in a series of joint ventures, from the Defendants.[1] They called those interests in 2014. With respect to the majority of

---

[1] The joint ventures at issue relate to various "Mills," a term that here refers to a type of indoor shopping center. Generally, each joint venture related to the development of a single "Mills-type" shopping center.

the joint ventures, the contractual consideration for the call transactions was required to be units ("Mills Units") in a by-then defunct real estate investment trust. Since they could not tender those units, the Plaintiffs sought to tender their own similar, but not identical, units ("Simon Units"). I determined that the joint venture agreements applicable there (the "JVAs") did not provide for such consideration.

With respect to one joint venture, however, the parties agreed in the JVA that "Mills," the entity, was defined for purposes of that joint venture as "Mills *or a successor entity*."[2] Therefore, I found, the call right could be exercised by tender of Mills Units *or* units of a successor, provided that the successor's units satisfied certain contractual conditions of similarity to Mills Units. Unquestionably, Simon Units are the units of Simon, a successor to Mills. The only question remaining is whether Simon Units offer "substantially the same" rights in certain contractually defined areas as would Mills Units. If so, they are valid tender.

The Plaintiffs seek specific performance of the call provision of this joint venture agreement. The matter has been tried (as part of the trial involving all the joint ventures purportedly subject to Simon's call), and this is my post-trial opinion as to that relief. Because I find that the Plaintiffs have prevailed on the merits by clear and convincing evidence, and because the equities support relief, I conclude

---

[2] I paraphrase here for brevity's sake; interested readers are referred to my 2017 Memorandum Opinion, *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *27 (Del. Ch. Mar. 30, 2017) (the "2017 Memorandum Opinion" or the "2017 Mem. Op.").

2

the Plaintiffs are entitled to specific performance.  My reasoning follows.

## I. BACKGROUND

This matter concerns a dispute over the proper tender required to exercise call rights in a series of joint venture agreements between two sophisticated groups of investors.  I have written two Memorandum Opinions and decided other matters along the winding course of this case.[3]  I assume familiarity with my previous Memorandum Opinions in the matter and include only those facts necessary for my narrow decision here.[4]

The Plaintiffs include a number of entities organized under an umbrella real estate investment trust (UPREIT) and referred to as "Simon."[5]  The Defendants are a group of Delaware limited partnerships with German investors known as "Kan Am."[6]  Non-party "Mills" was a "real estate investment vehicle" that was "acquired and ultimately dissolved by a joint venture of Simon and an unrelated third-party in 2007."[7]

Simon and Kan Am both hold interests in the Orange City Mills Mezzanine II Limited Partnership ("Orange City Mills").[8]  In previous holdings, I noted that,

---

[3] *Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2014 WL 4840443, at *1 (Del. Ch. Sept. 30, 2014) (the "2014 Mem. Op."); 2017 Mem. Op. at *1.
[4] I use the same defined terms as those Memorandum Opinions unless specifically designated here.
[5] The parties' numerous entities are described in my 2017 Memorandum Opinion at *3.
[6] *Id.*
[7] *Id.* at *4.
[8] *Id.* at *3.

compared with the other JVAs at issue in this matter, the Orange City Mills joint venture agreement (the "JV Agreement") contained "unique language relating to successor interests and the substitution of successor units as the proper buy/sell consideration."[9] I held that Simon, as a successor to Mills, must be construed as "Mills" under the JV Agreement.[10] As a result, I found, its units, if otherwise contractually compliant, are effective Mills Units, "which are contractual tender for the call for Kan Am's interest in this [Orange City Mills] JV."[11] This left a single issue to be addressed in this supplemental decision: can Simon tender successor units that are compliant with the JV Agreement?[12]

Section 11.3(f) of the Orange Mills JV Agreement states in its entirety:

Any Units received by the Kan Am Partners pursuant to this Section 11.3 shall have *substantially the same rights* (*including redemption, conversion, registration and anti-dilution protection*) as attached to units issued in connection with the formation transactions of TMLP and Mills Corp., as more fully described in the Registration Statement for Mills Corp. dated April 14, 1994 and the exhibits thereto and Amendment No. 1 to Form S-3 for Mills Corp. dated May 28, 1996.[13]

---

[9] *Id.* at *27.
[10] *Id.* at *28.
[11] *Id.* at *27–28.
[12] *Id.* at *28.
[13] JX155 (Orange City Mills JVA), § 11.3(f) (emphasis added).

I asked the parties for supplemental briefing, which they provided. I heard oral argument on August 29, 2017. The parties considered settlement, then provided supplemental submissions; they confirmed the matter as fully submitted on February 7, 2018.

## II. ANALYSIS

Simon seeks to specifically enforce its call right to acquire Kan Am's interest in Orange City Mills. "[S]pecific performance [i]s an extraordinary remedy, not to be awarded lightly," granted only to a party who "prove[s] by clear and convincing evidence that she is entitled to specific performance and that she has no adequate remedy at law."[14] To prove entitlement to specific performance, a party must "establish, by clear and convincing evidence, that (1) a valid, enforceable, agreement exists between the parties; (2) the party seeking specific performance [is] ready, willing, and able to perform under the terms of the agreement; and (3) a balancing of the equities favors an order of specific performance."[15] In addition, "[t]he decision as to the availability of specific performance rests within the sound discretion of this Court."[16]

### A. The Simon Units Provide Substantially the Same Rights

As I stated in the 2017 Memorandum Opinion,

---

[14] *Halpin v. Riverstone Nat'l, Inc.*, 2015 WL 854724, at *5 (Del. Ch. Feb. 26, 2015).
[15] *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).
[16] *Id.*

5

[t]he only question remaining is whether Simon, once read into the agreement per the definition, can offer compliant units pursuant to Section 11.3(f). Section 11.3(f) provides that: "[a]ny Units received by [Kan Am] pursuant" to this Section 11.3 shall have substantially the same rights (including redemption, conversion, registration and anti-dilution protection) as attached to units issued in connection with the formation transactions of [Mills Partnership] and Mills Corp. . . ."[17]

Kan Am concedes that "there may not be substantial differences with respect to registration and anti-dilution rights" between the Mills and Simon Units.[18] Consequently, my inquiry focuses on whether the redemption and conversion rights in the Simon Units were "substantially similar" to those in the Mills Units.

I first note, however, that Kan Am frames the current inquiry, relying on language from the 2017 Memorandum Opinion, as whether Simon Units "possess the requisite characteristics, including liquidity *and tax avoidance*, required of compliant Mill Units."[19] Accordingly, Kan Am spends significant effort describing the potential differences in various types of tax risk and other considerations, particularly under German law, posed by the two units to its investors.[20] However, I did not intend by this language to expand the scope of the inquiry outside of the contractual language of the JV Agreement. That Agreement did not make successor units acceptable as tender based on tax consequences to individual investors of Kan

---

[17] 2017 Mem. Op. at *28; JX155 (Orange City Mills JVA), § 11.3(f).
[18] Supp. Post-Trial Br. Regarding Orange City Mills of Defs & Countercl. Pls. (the "Ans. Br.") 3.
[19] *Id.* at 1; 2017 Mem. Op. at *27 (emphasis added).
[20] Ans. Br. 17–24.

6

Am, wherever located. The "tax avoidance" issue under the JV Agreement arises in Section 11.3(d), requiring compliance with IRS Code Section 721, which has the result that transactions in the units are tax free under American law. As stated in the 2017 Memorandum Opinion, "[t]he *only question remaining* [for this Letter Opinion] is whether Simon, once read into the agreement per the definition, can offer compliant units pursuant to Section 11.3(f). Section 11.3(f) provides that '[a]ny Units received by [Kan Am] pursuant to this Section 11.3 shall have substantially the same rights (including redemption, conversion, registration and anti-dilution protection).'"[21] I turn, then, to the redemption and conversion rights.

I find that the redemption and conversion rights in the Simon Units are substantially similar to those in the Mills Units. As Kan Am points out, they are not identical.[22] Simon and Mills both desired to provide liquidity to their unit holders. But Simon and Mills also sought to avoid IRS designation as "Publicly Traded Partnerships" ("PTPs"). Under the United States Internal Revenue Code, such a designation would have negative tax consequences. PTP designation risk[23] may increase if an "established securities market" for the partnership's units arises, which

---

[21] 2017 Mem. Op. at *28 (emphasis added).

[22] The units need not be identical, only substantially similar, to satisfy the JV Agreement as tender. 2017 Mem. Op. at *28 ("To be compliant, however, successor units in the Orange City JV need not be identical to any particular Mills Units; they only need to provide substantially the same rights in the four delineated areas.").

[23] The primary risk factor for a PTP determination here is whether a transfer of units would be viewed by the IRS as transacted under the "substantial equivalent" of a secondary market. *See* Trial Tr. (Simon tax expert Blanchard) 1492:16–1494:1.

may be deemed to exist if too frequent exchanges of units occur.[24]  In light of that

risk, both Simon and Mills restricted the redemption and conversion of their units,

albeit in different ways, while preserving liquidity for unit holders.  The difference

between these two approaches forms the bulk of the "substantially similar" inquiry

before me.

Section 9.2 of the Simon LP Agreement provides that the "Limited Partners

shall not Transfer all or any portion of their . . . Units to any transferee without the

consent of the General Partner, which consent may be withheld in its sole and

absolute discretion."[25]  Section 9.2 does not distinguish between types of transfers,

such as conversion and redemption.[26]  The Simon LP Agreement states in Section

9.4(a)(x) that, regardless of general partner consent, a transfer of Simon Units is

restricted "if such Transfer is effectuated through an 'established securities market'

or a 'secondary market (or the substantial equivalent thereof)' within the meaning

of Section 7704(b) of the Code."[27]  Thus, Simon grants discretion for unit

redemption and conversion to its general partner but prohibits transfers that would

trigger PTP designation.

The Mills LP Agreement separated transfer and redemption rights into two

---

[24] *Id.*
[25] JX0361 (Simon LP Agreement), § 9.2.
[26] *Id.*
[27] *Id.* § 9.4(a).

8

separate provisions.[28]  The Mills Units, subject to restrictions not relevant here, could be redeemed

> during the four thirty-day periods immediately following the filing with the Securities and Exchange Commission by the REIT of its annual report on Form 10-K or quarterly reports on Form 10-Q or during such periods as the Partnership may otherwise determine . . . by providing the General Partner with a Redemption Notice.[29]

During the four thirty-day periods, Mills had no discretionary right to block these redemptions.[30]  I note that Mills could, however, effectively prevent occurrence of these thirty-day periods by refusing to file certain SEC forms, as it did in 2005.[31] Non-redemption transfers required the affirmative consent of the general partner, which could be "granted or withheld in the sole and absolute discretion of the General Partner."[32]  However, the general partner could not permit a transfer to "be effected through an 'established securities market' or a 'secondary market (or the substantial equivalent thereof)' within the meaning of Code Section 7704."[33]  Thus, Mills created four thirty-day periods for redemptions not subject to general partner discretion, but otherwise required affirmative general partner consent for transfers. Similar to Simon, Mills prohibited transfers that could trigger PTP designation.  Both Mills and Simon used an UPREIT structure and provided that the limited partnership

---

[28] JX0007 (Mills LP Agreement) §§ 8.1–8.8 (all other transfers), §§ 9.1–9.6 (redemptions).
[29] *Id.* § 9.1(A).
[30] *Id.* §§ 9.1–9.6.
[31] 2017 Mem. Op. at *9.
[32] *Id.* § 8.4(A).
[33] *Id.* § 8.4(D).

units were redeemable and convertible for cash or the publicly traded stock of the REIT parent.[34]

Simon points to concessions by Kan Am experts and principals at trial that the Simon and Mills Units are substantially similar in terms of their redemption, conversion, registration, and anti-dilution rights.[35] Kan Am counters that Simon ignores other relevant testimony that renders Simon's trial citations "misleading."[36] I disagree; the record is clear that the witnesses found the conversion rights substantially similar. Nonetheless, Kan Am points out that redemption of Simon Units is subject at all times to discretion of its general partner. Kan Am argues that this is more restrictive than the Mills scheme, with its thirty-days-per-quarter windows during which unit holders were permitted to redeem Mills Units. In Kan

---

[34] Trial Tr. (Kan Am expert David Fick) 1168:4–17.

[35] *See, e.g.*, Trial Tr. (Kan Am expert David Fick) 1168:23–1169:4 ("Q. [A]s far as those characteristics, which were the redemption rights, anti-dilution rights, conversion, and registration rights, Simon units and Mills units are the same; right? A. Yes."); Trial Tr. (Kan Am tax expert James Croker) 1275:16–1276:1 ("Q. . . . And you remember testifying at your deposition that Simon units and Mills units are essentially comparable in terms of those characteristics? A. They originally had those. They originally each had those, yes. Q. Right. And you haven't identified in your report any differences with respect to those four characteristics between the two units. Right? A. No, I didn't."); Trial Tr. (Kan Am principal T. Kent Hammond) 944:10–945:1 ("Q. . . . And in the context of the negotiation of these four agreements, in terms of the anti-dilution characteristics of Mills units versus Simon units, you don't recall perceiving any differences between the two types of units, do you? A. No. Q. The same question with respect to redemption. You don't recall perceiving any differences between the redemption characteristics between Mills units and Simon units in the context of these original joint ventures, correct? A. Sitting here today, I don't. Q. And if I asked you the same question with respect to conversion and redemption, your answer would be the same? A. Sitting here today, I don't."); Trial Tr. (Kan Am principal James Braithwaite) 702:14–703:8 (stating his previous belief that the Mills and Simon units were the same in regards to anti-dilution, registration, and redemption).

[36] Ans. Br. 15–16.

Am's view, this renders the redemption and conversion rights of Simon and Mills substantially different.[37]

The JV Agreement does not require that the conversion rights be identical. That would render the explicit right of a successor to Mills to be treated as Mills, with respect to exercise of the call right at least, illusory. Here, the intent and effect of the restrictions on the units are the same, to preserve liquidity while avoiding PTP status. Neither set of units, to my mind, includes restrictions on conversion substantially more onerous than the other, literally or practically. Based on the evidence, I find that Simon has met its burden to prove by clear and convincing evidence that the Simon Units are substantially similar to Mills Units in terms of their redemption, conversion, registration, and anti-dilution rights under Section 11.3(f) of the Orange City Mills JV Agreement.

B. *The Equities Favor Specific Performance*

I find that Simon is entitled to specific performance of its call right in the Orange Mills JV. My reasoning follows.

The first element required for specific performance is not in dispute: a valid, enforceable agreement exists between the parties. In dispute here was the second element: whether Simon is ready, willing, and able to perform *under the terms of the JV Agreement*, given that Simon seeks to exercise its call right using Simon Units

---

[37] *Id.* 14.

under Section 11.3(f). As explained above, I find that Simon meets its burden by clear and convincing evidence. Third, I must weigh the equities to determine if they favor an order of specific performance. I find that they do.

The other JV agreements formerly at issue in this matter neglected to provide for rights of successors and successor currency. This neglect, I noted, would have made Simon's road to specific performance difficult even if it had prevailed on its contractual claims.[38] Here, however, Simon became a partner in Orange City Mills with the understanding that, as successor to Mills, it would enjoy the explicit contractual rights afforded in the JV Agreement to successors, including the call right. Moreover, by its terms, the JV Agreement provides for specific performance in this regard, a term the parties clearly bargained for. In other words, absent specific performance, Simon would lose a valuable right not otherwise remediable.

I have found above that the redemption and conversion rights of Mills and Simon Units are substantially similar. To the extent any dissimilarity might injure Kan Am's investors, however, Simon has offered to ameliorate the issue. In its Reply Brief and subsequent letters to the Court, Simon indicated that it would "stipulate to the inclusion of a provision in the Court's final implementing order

---

[38] 2017 Mem. Op. at *32 ("Further, in light of its knowledge of, but failure to address, the issue of consideration in the JV Agreements, Simon would find difficult its burden to show by clear and convincing evidence that equity would favor specific performance even if I had found that Simon Units were contractually-compliant.").

ensuring that Mills' PTP risk mitigation process would apply to any Simon Units that the three Kan Am funds (or their investors) receive in connection with the Orange City JV."[39] Simon would also not object "to the inclusion in such an order of a stipulation that it will not exercise its rights under Section 9.4(a)(x) to block Kan Am or its investors from redeeming any such units during the applicable quarterly windows."[40] I rely on these statements here, and any final order in this matter should incorporate these stipulations to the extent Kan Am desires them. As a consequence, even unsubstantial differences between the units cease to be an equitable factor against specific performance.

To the extent Kan Am alleges that an increased risk of local tax liability for its investors makes specific enforcement inequitable, I note that such concerns could have been but were not addressed in the JV Agreement. Nothing in that Agreement required Mills or its successors to take into account injury due to local tax assessment against individual investors when deciding whether to call units, although, of course, the Joint Venture Agreement could have so limited Mills' rights. Kan Am argues that certain aspects of Simon and its investments make taking Simon Units, from a tax perspective, riskier than receiving Mills Units, to Kan Am's investors. These are not differences in the units from a contractual perspective, however; they are simply

---

[39] Simon Parties' Supp. Reply Mem. Concerning the Orange City Venture (the "Reply Br.") 16.
[40] *Id.*

13

an artifact of Simon's current ownership of assets.[41]  At any rate, nothing in the Joint Venture Agreement prevented Mills *itself* from taking on the attributes which Kan Am ascribes to Simon, allegedly creating increased investor tax risk.[42]  Therefore, I do not find imposition of specific performance equitably offensive to Kan Am.  It is simply receiving the benefit of its bargain.

For all these reasons, I find that a balancing of the equities favors an order of specific performance.

## III. CONCLUSION

I find that the Simon Units provide substantially the same rights as the Mills Units under Section 11.3(f) of the JV Agreement.  In addition, I find that a balancing of the equities favors an order of specific performance.  The parties should confer and submit an appropriate form of order, in accordance with this Letter Opinion.

Sincerely,

*/s/ Sam Glasscock III*

Sam Glasscock III

---

[41] Kan Am points out that Simon has over 600 LLCs and that Simon's "use of LLCs may expose German investors to negative German tax consequences, because the LLC may, depending on how it is structured and governed, be viewed as more akin to a corporation than a partnership, and is thus not considered 'transparent' under German tax law." Ans. Br. 19–22.  This could expose the German investors to double taxation in both the United States and Germany. *Id.* 22.

[42] Kan Am alludes, in a footnote in its Answering Brief, to Simon's real estate investments outside the U.S. which, according to Kan Am, may have negative tax implications for *Simon* in the U.S.  Ans. Br. 22–23, 23 n.80.